## Rea Trust

*Aaron S. Swartz, Jr.*, and *Charles Myers*, for accountant.

*William P. Manning, Jr.*, and *Richard K. Stevens*, for life beneficiary.

TAXIS, P. J., July 20, 1962.—The account of Girard Trust Corn Exchange Bank (formerly known as Girard Trust Company), trustee under deed dated May 1, 1928, for Ruth Rea Junkin and Anne Thorp Rea Jewell, was examined and audited by the court on June 15, 1961 . . .

Accountant claims $1,500 compensation, payable from principal, for alleged special services rendered in connection with the administration of certain close corporation holdings. Objections to this payment have been filed on behalf of Ruth Rea Junkin, a life-tenant, on the grounds that the trustee's compensation has been fixed by agreement with settlor, and that any special services rendered have not been of the type warranting special compensation.

The trust was created by a deed dated May 1, 1928. There was no specific provision relating to the compensation of the trustee. The only general language possibly touching the problem is that contained in paragraph first, wherein the trustee is instructed "To hold the said assets, and . . . to collect the income therefrom, and after the payment of all proper costs and charges to pay the net income to Grantor during the term of his natural life, and upon the death of Grantor to make the following payments out of principal. . . ."

On May 2, 1928, however, J, M. Steere, an officer of the trustee, wrote to settlor as follows, inter alia:

"I would suggest commissions of two-and-a-half per cent on this account, and perhaps you will let me know if this will be satisfactory."

To this Mr. Rea replied:

". . . would advise that the commission of two-and-a-half per cent is entirely satisfactory."

Thus stands all of the evidence relating to the agreement fixing the trustee's compensation. The trustee has collected two and one-half percent on income throughout the administration of the trust. It has, however, received nothing from principal, and if it were held that the agreement in question restricts commissions to income only, this claim and the one following could be quickly dismissed.

There is no question that a binding agreement as to the compensation of a fiduciary forecloses the allowance of a greater amount for services rendered under its provisions. Likewise, there is no doubt that, in the absence or inapplicability of such an agreement, the fiduciary is entitled to reasonable compensation from principal for the responsibility of its management and its preservation thereof: Culbertson's Appeal, 84 Pa. 303.

In Betts' Estate, 198 Pa. 640, a direction that executors " 'shall be entitled to deduct from the gross income of my estate for their services as such executors the sum of five per cent thereon' " was held to preclude any principal commissions. Opposed to this, we find the problem more lately considered in Kennedy Trust, 364 Pa. 310, where the deed specifically provided for a commission of five percent on income, but made no similar reference to principal; it provided only that, at the death of settlor's wife, the estate should be distributed in a certain fashion "after the payment of all the expenses of executing the Trust . . . and all lawful charges on the property in the Trust Estate . . ." In the Kennedy case, compensation from principal was awarded to the trustees, the court stating that, "There is no suggestion that the deductible commission on income was to be in complete discharge of the trustees' service with respect to corpus . . ."

Objectors suggest that Kennedy Trust is not applicable, inasmuch as in that case principal distributions, as well as income, were to be made "after the payment of . . . expenses . . . and . . . charges . . ." The difficulty with this argument is that, at best, the language in the present deed is equivocal on this point; after "the payment of all proper costs and charges" is directed, both income and, ultimately, principal are disposed of. Principal commissions are, however, the rule and not the exception, and the most reasonable

interpretation of the language quoted from the deed and correspondence above set forth is that the parties contemplated principal as well as income commissions both at the rate of two and one-half percent. The rate of the commissions, by itself, circumstantially confirms this conclusion. In any event, Kennedy Trust stands for the proposition that if a trustee is to be deprived of principal commissions, there must be an unequivocal agreement or direction to that effect, whereas in this case the true intention of settlor will probably never be wholly free from doubt.

Having determined that principal as well as income commissions are payable, it still remains to be seen whether any services rendered by the trustee warrant special compensation. In this connection, the sole witness was Walter T. Diener, an assistant investment officer of the Girard Trust Corn Exchange Bank. Mr. Diener testified that he had been with the bank approximately 30 years, and that for a substantial period of that time he had worked on the Rea account. The alleged extraordinary services were performed in regard to stock of the Cord Meyer Development Company, one of the original issues deeded to the trustee. As owner of this stock, the trustee became entitled to purchase stock of the Seminole Management Corporation, Seminole Housing Corporation, and Balfour Housing Corporation, at various times beginning in 1949. These corporations were set up for various special purposes, as part of the land development activities of Cord Meyer. The action required the trustee to investigate each of the corporations and determine the desirability and safety of the proposed investments. On one occasion, Mr. Diener travelled to New York for personal consultations.

The capital gain on these three relatively small investments has been in excess of $20,000 to date. There is, of course, no doubt that this return emanated chiefly

from the business acumen of the managers of the various corporations, and not from the trustee; nevertheless, the investment was speculative in nature, and had to be carefully examined and considered, not only by Mr. Diener, but also by the trustee's investment committee. Mr. Diener testified that he spent a total of 101¼ hours on this matter, and that the trustee's charge for cost analysis purposes for this time was $1,006.23. There was, however, no further explanation of the method of reaching this figure.

A trustee may be compensated for special services or unusual work or labor by an allowance from principal: Williamson Estate, 368 Pa. 343. Such compensation may be awarded even if in excess of an agreed amount, for it is only reasonable that an agreement as to compensation contemplates only ordinary or usual duties, unless the opposite is specifically provided. In addition, such compensation may be paid before the final termination of the trust, where the circumstances justify such action: Caldwell Estate, 2 Fiduc. Rep. 44; Powers' Estate, 58 D. & C. 379. And it has been held in Kennedy Estate, 65 D. & C. 575, 579, "That where the compensation has been agreed upon, whether by deed or trust or, in the case of a will, by agreement between testator and fiduciary, extra compensation will be allowed only where the services rendered were extraordinary in character and not in extent . . ."

A mere increase in the dollar value of the estate or trust is, of course, insufficient by itself to warrant extra compensation. When, however, such an increase occurs as the result of a carefully investigated and specialized investment, it no longer is merely incidental to the management of the trust, but has become a result of that management, and such efforts should be reasonably compensated. Cf. Wolfsohn Estate, 20 D. & C. 2d 639. After all, the true test for the allowance of compensation to a fiduciary is to determine what is

fair and just for the responsibility undertaken and the services performed (Miller's Estate, 132 Pa. Superior Ct. 437), and most of the rules announced by the appellate courts are only guideposts to this desired objective. It is not ordinary, even in these days of complex corporate financing, for a shareholder in one corporation to obtain thereby an opportunity to invest in another, with different activities and purposes from the original. Effort expended and work done in investigating such investment opportunities is not merely more work of the type which the trustee in 1928 agreed to do for two and one-half percent commissions; it is rather administrative work of a quite different character from that involved in the handling of the original Cord Meyer stock.

In passing upon this matter, this court is not so much depending upon testimony of the time spent on this matter, or its alleged cost basis on the books of trustee, as it is upon the overall picture of the compensation payable from this trust. It is true that the trustee agreed to its compensation, and that therefore it would be permissible to construe that agreement strictly against its interest. But this trust is in its thirty-fourth year; and it is a trite observation that what was fair and adequate compensation in 1928 (and for many years thereafter) is, frequently, no longer so. In all the circumstances of this case, it is not reasonable or equitable to extend the trustee's agreement beyond that which it clearly encompassed, namely, the ordinary duties and responsibility attached to the trust administration. Accordingly, special compensation of $1,500 is hereby allowed the trustee, the same *not* to be on account of or to be charged against any other commissions ultimately allowed from the principal of this trust.

The trustee also seeks interim principal compensation in the amount of $5,000. It bases its claims essen-

tially on the Act of May 1, 1953, P. L. 190, 20 PS §3274, which authorizes such payments under certain circumstances. Ruth Rea Junkin also opposes this claim, alleging that the agreement between settlor and the trustee respecting commissions does not permit such an allowance, and that the above quoted statute is inapplicable to this case by its own terms. In addition, another issue presents itself, which is the applicability of this statute to trusts which originated prior to its enactment.

As to the agreement, it contains nothing in specific reference to the time of payment of commissions. Of itself, it neither authorizes nor forbids the present claim, and cannot assist in reaching a decision on this point. Its effect is confined to the determination of the amount which is to be paid the trustee for his services.

Section 4 of the Act of 1953, supra, contains the following language: "Where the compensation of a fiduciary is expressly prescribed either by provisions of a will or deed of trust or other instrument under which he is acting or by provisions of an agreement between him and the creator of a trust, nothing in this act shall change in any way the rights of any party in interest or of the fiduciary." It is argued from this that the existence of an agreement setting the trustee's compensation prevents the application of the statute to this case.

The plain meaning of the language quoted, however, is not as contended; it simply operates to leave unaffected any rights which have been established by a prior agreement as to compensation. There is nothing in the statute to suggest that it is totally inapplicable where there is an agreement which says nothing about the time of payment of commissions. Prior to the enactment of the Act of 1953, no interim compensation could be paid, unless for extraordinary services, and it was therefore pointless for testators or settlors to

prescribe the time of payment of principal commissions. Hence, to infer from such silence that the parties did not intend interim commissions to be paid would be a misleading oversimplification of this very important problem.

The main provision of the statute (section 2) reads as follows:

"Whenever it shall appear either during the continuance of a trust or at its end, that a fiduciary has rendered services for which he has not been fully compensated, the court having jurisdiction over his accounts shall allow him such original or additional compensation out of the trust income or the trust principal or both, as may be necessary to compensate him for the services theretofore rendered by him."

It is manifest, after 33 years of administration, that this trustee "has rendered service for which he has not been fully compensated." The problem presented by this enactment is not whether the legislature intended it to apply to situations like the present one, for plainly it did, and it so provided in section 5; the real nub is whether it may be constitutionally applied to trusts which arose prior to May 1, 1953. This issue has been considered to some extent by this court in Stotesbury Estate, 85 D. & C. 551, and in Colton Estate, 11 D. & C. 2d 538. It should be noted in passing that objections to interim commissions usually come from life-tenants, as they are thereby deprived of corpus from which income would otherwise be derived. Remaindermen must, in any event, have their share charged with commissions, and are usually indifferent to the time of payment, though even here there might be objections if assets subject to appreciation had to be liquidated to pay such commissions.

In Stotesbury Estate, supra, it does not appear that the constitutional problem was considered in detail, as the parties in interest had, prior to the adjudication,

worked out between themselves a plan of payment satisfactory to all of them. In Colton Estate, supra, the matter of constitutionality was submitted to the court for adjudication by the accountant, no objections being filed. In that case, the court said: "The only possible injury is visited upon life tenants who lose the future income which the amount of the interim principal compensation would produce. Does such loss to the life tenant bar a retroactive application of the Act of 1953? I think not. Such loss is minor and is but incident to a change in a rule of trust administration."

Since objections have been pressed herein, a somewhat closer consideration of this problem is required. A fundamental tenet of constitutional law is that retroactive application of a statute is prohibited if a vested property right is thereby destroyed: Crawford Estate, 362 Pa. 458. In that case, it was held that a life-tenant had a vested right to apportionment between principal and income under the established Pennsylvania Rule governing that problem, and that the Principal and Income Acts of 1945 and 1947 could not be retroactively applied so as to change that rule. Although that case does not relate factually to the legal problem here, its recent overturning by the Supreme Court throws much light on the precise nature of a vested property right.

In Catherwood Trust, 405 Pa. 61, the Supreme Court overruled Crawford Estate, supra, and held that the Principal and Income Act, with its Massachusetts Rule of Apportionment, could and should be applied to estates and trusts arising prior to its enactment. At page 71, the following was said:

"Certain principles of law are beyond dispute: (1) a gift of an equitable life estate in income or of an estate in remainder does constitute a grant of a vested property right of which the recipients cannot be divested by legislative action; (2) a vested property

right cannot exist in a rule of law, although a rule of law may establish a vested property right; (3) where an interest is declared vested by this Court, such interest cannot be altered or extinguished by the retroactive effect of any statute. That these life tenants have a vested property right in the *income* from this trust cannot be questioned. Stated otherwise, if there be *income* arising from the trust, in such *income* the life tenants have such a property right that brooks no legislative interference. The present Act in nowise alters or extinguishes a right to the income arising from the trust."

The rule that no principal commissions should ordinarily be paid prior to termination of a trust is a judicially made rule of law, no more. No life-tenant can have any vested interest in such a rule. If, in order to compensate a trustee properly for services rendered by him, sums must be paid out of principal, this does not, under the rationale of Catherwood Estate, affect the vested right of the life-tenants to income. It is almost inevitable that the allowance of interim principal commissions will prevent some income from being earned, which would otherwise be earned; but under no view of the case could such allowance affect the rights of a life-tenant in the income which actually does arise. I therefore hold that the Act of 1953 may be applied to trusts arising before the date of its enactment, and I conclude therefore that interim commissions should be allowed in this trust.

As to amount, the securities received by the trustee on May 1, 1928, were worth approximately $516,000. There remain from this amount, after the payment of administration expenses, the incurrence of some losses, and after certain distributions at the death of settlor, assets with an account value of approximately $385,000, but with a present worth of some $504,000. Total commissions on principal will therefore amount

to something more than $12,000, and it seems safe to permit an interim commission of $5,000, as claimed, on an administration of 33 years. Accordingly, an interim principal commission of $5,000 is allowed, to be on account of, and to be charged against, such commissions as are ultimately allowed from principal . . .

The account, as modified by this adjudication, is confirmed, and it is ordered and decreed that Girard Trust Corn Exchange Bank (formerly known as Girard Trust Company), trustee, as aforesaid, forthwith pay the distribution herein awarded.

And now, July 20, 1962, this adjudication is confirmed nisi.